UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| KATHY KOCUREK, ET AL | CIVIL ACTION NO. 16-0543 |
| VERSUS | JUDGE ELIZABETH FOOTE |
| FRANK'S INTERNATIONAL, LLC, ET AL | MAGISTRATE JUDGE HANNA |

## MEMORANDUM RULING

Before the Court is a motion for summary judgment by Defendants Frank's International, LLC ("Frank's") and Gary Luquette ("Luquette"). [Record Document 47]. For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED IN PART and DENIED IN PART**. Plaintiffs, Le Chat Interiors, Inc. ("Le Chat") and Kathy Kocurek ("Kocurek"), have failed to demonstrate the existence of a genuine dispute of material fact regarding their claim that Luquette engaged in tortious interference with a contract. Because further discovery will determine whether there is a genuine dispute of material fact regarding the extent of Le Chat's lost hourly wages, summary judgment is denied on this claim. Summary judgment is likewise denied on Le Chat's claims for lost profits and lost business opportunities, as Plaintiffs have met their burden of production on these claims. However, summary judgment is granted as regards Le Chat's claim for damage to its reputation. Finally, Defendants' summary judgment motion is granted on each of Kocurek's individual claims because she was not a party to any contract with Frank's.

## I. Background

Le Chat and Kocurek, Le Chat's owner, brought this suit against Frank's and Luquette, Frank's former president and CEO. [Record Document 45 at 5]. The suit alleges that Frank's

1

breached a contract with Le Chat to design the interior of a new office building in Lafayette, Louisiana ("the Lafayette Project") and that by terminating Frank's relationship with Le Chat, Luquette engaged in tortious interference with a contractual relationship. [Record Document 45 at 6–7].

In 2013, Frank's contacted Le Chat to determine whether Le Chat would be interested in developing the interior design for the Lafayette Project. [Record Document 47-4 at 78]. After agreeing to accept the job, Le Chat prepared a Letter of Engagement ("Letter of Engagement"), which was signed on March 14, 2013 by Kocurek and Keith Mosing ("Mosing"), Frank's then-CEO. [Record Documents 47-4 at 32–33, 280]. The Letter of Engagement indicated that Le Chat would be paid $100 per hour for its "interior design services" to "complete the project" at Frank's; the services were to include "developing a color scheme, sourcing furniture, spatial planning, fixtures, wall coverings, fabrics and materials; design[ing] custom furniture and built ins; design[ing] window treatments where applicable; select[ing] materials for flooring, counters and cabinetry, hardware, and present[ing] selections that represent the best choices for your space." [Record Document 47-5].

Le Chat performed design work for approximately two years, for which it billed and was paid at its hourly rate. [Record Documents 47-1 at 5, 47-4 at 28, and 47-6 at 1–2]. In January 2015, Luquette replaced Mosing as President and CEO of Frank's. [Record Document 54-4 at 3]. After assuming his position, Luquette convened a team to review the Lafayette Project; the team's report determined that Le Chat's design choices could be simplified and standardized to reduce costs. [Record Document 47-3 at 54–55 and 47-7 at 1–2, 23]. On March 11, 2015, Luquette met with Kocurek and terminated Le Chat's involvement with the Lafayette Project. [Record Document 54-4 at 5]. Interior design work for the Lafayette Project was completed by Gensler Architecture, Design,

and Planning, P.C. ("Gensler"). [Record Document 47-7 at 2]. Plaintiffs filed suit in the Fifteenth Judicial District Court in Lafayette, Louisiana; Defendants then removed the case to this Court. [Record Documents 1 and 1-2 at 3].

Plaintiffs contend that Luquette tortiously interfered with the contract between Le Chat and Frank's when he terminated Le Chat's contract prior to the Lafayette Project's completion. [Record Document 45 at 7–8]. They argue that by selecting Gensler, a company with which he had worked before, Luquette acted against Frank's best interests. [Record Documents 45 at 5 and 54 at 8].

Plaintiffs further allege that Frank's breached its contract with Le Chat by terminating the business relationship prior to the completion of the Lafayette Project. [Record Document 45 at 6–7]. Plaintiffs contend that this breach deprived Le Chat of the opportunity to earn a commission from the sale of furniture and accessories to Frank's. [Record Document 47-4 at 33–36]. In addition, Plaintiffs allege that they incurred lost business opportunities when Le Chat declined other design work because it was too busy with the Lafayette Project. [Record Documents 45 at 6 and 54 at 11–13]. Finally, Plaintiffs allege lost wages for the remaining work that Le Chat was not allowed to complete on the Lafayette Project. [Record Document 45 at 6].

## II. Analysis

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Summary judgment is appropriate when the pleadings, answers to

---

[1] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56

3

interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere "'scintilla' of evidence." *Id.* (first quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); and then quoting *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir. 1994)) (first citing *Lujan v. Nat'l Wildlife Fed'n*, 947 U.S. 871, 871–73 (1990); and then citing *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994)). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986) (citing *U.S. Steel Corp. v. Darby*, 516 F.2d 961 (5th Cir. 1975)) ("The court will review the facts drawing all inferences most favorable to the party opposing the motion."). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment

---

prior to its amendment remains authoritative, and this Court will rely on it accordingly.

in the nonmovant's favor. *Little*, 37 F.3d at 1075 (citing *Armstrong v. City of Dall.*, 997 F.2d 62 (5th Cir. 1993)).

### B. Le Chat's Tortious Interference Claim

Plaintiffs allege that by terminating the agreement before Le Chat had "completed" design work on the Lafayette Project, Luquette committed tortious interference with Le Chat's contract with Frank's. [Record Documents 45 at 7–8]. In response, Defendants argue that the decision to terminate the contract, even if it was a breach, was justified under the circumstances and thus that Luquette is not liable. [Record Document 47-1 at 18–20].

To establish tortious interference with a contractual relationship, a plaintiff must prove:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 234 (La. 1989). Although it appears that the parties do not dispute the first three elements,[2] the parties did not fully brief them. Therefore, the Court will assume that a contract existed between Le Chat and Frank's, that Luquette was aware of this contract, and that he intentionally caused Frank's to breach its contractual obligations.

The parties dispute whether Luquette had an appropriate justification for terminating the contract prior to the completion of the Lafayette Project. [Record Document 47-1 at 18–20 and 54 at 11–13, 21]. A corporate officer's conduct is justified "if he acted within the scope of his corporate

---

[2] *See* Record Document 47-1 at 12–15 (discussing only the fourth element of tortious interference claim); Record Document 54 at 2 (asserting that the Letter of Engagement constituted a contract); Record Document 47-3 at 13–14, 17 (containing Luquette's testimony describing the Letter of Engagement as a contract and his process for terminating it).

5

authority and in the reasonable belief that his action was for the benefit of the corporation." *Spurney*, 538 So. 2d at 231; *see Grant v. Farm Credit Bank of Tex.*, 841 F. Supp. 186, 190 (W.D. La. 1992), *aff'd*, 8 F.3d 295 (5th Cir. 1993); *Dorsey v. N. Life Ins. Co.*, No. 04-cv-0342, 2005 WL 2036738, at *17 (E.D. La. Aug. 15, 2005); *Hampton v. Live Oak Builders, Inc.*, 608 So. 2d 225, 226 (La. Ct. App. 1992). All parties agree that as President and CEO, Luquette had the authority to terminate the Le Chat contract. [Record Document 47-1 at 18]. Indeed, Plaintiffs expressly allege as much: "Luquette, as the new President and CEO, had the power and authority to bind and dissolve contracts on behalf of Frank's International." [Record Document 45 at 5]. As a result, this Court may assume that Luquette did not exceed the scope of his authority when terminating the Le Chat contract.

When first recognizing the tort of tortious inteference, the Louisiana Supreme Court identified a corporate officer's fiduciary duty toward the corporation as a source of the officer's immunity from tort liability. *Spurney*, 538 So. 2d at 232 (citing La. Stat. Ann. § 12:226 (2010)).[3] Under the Louisiana Business Corporation Act, an officer is immune from liability to shareholders for her business decisions so long as she acts "[i]n good faith, . . . [w]ith the care that a person in a like position would reasonably exercise under similar circumstances, [and] [i]n a manner [she] reasonably believes to be in the best interests of the corporation." La. Stat. § 12:1-842(A) (Supp. 2017). Hence, an officer breaches her fiduciary duty only when she acts in bad faith, unreasonably, or in a manner that she does not reasonably believe is in her corporation's best interests. As a result, an officer's reasonable business decision to cause her corporation to breach a contract is not a breach of her fiduciary duty to the corporation unless she lacked a reasonable belief that she was acting in

---

[3] Although *Spurney* cited Louisiana's non-profit corporation law, the same principles that shield corporate officers from liability apply to both non-profit and business corporations. *Compare* La. Stat. Ann. § 12:1-842(A)(3) (Supp. 2017) (business corporations) *with* La. Stat. Ann. § 12:226(A) (2010) (non-profit corporations).

the corporation's best interests. Thus, if she believed she was acting in the corporation's best interests, then her decision cannot give rise to personal liability to the corporation. It follows, then, that a similarly well-reasoned decision to cause the corporation to breach a contract does not generate tort liability to the other party to the contract, provided that the officer reasonably believed she was acting in the corporation's best interests. *See Spurney*, 538 So. 2d at 234–35; *Spencer-Wallington, Inc. v. Serv. Merch., Inc.*, 562 So. 2d 1060, 1064 (La. Ct. App. 1990) ("In *Spurney*, the duty of the third party independent of the contract [i]s the fiduciary duty imposed upon the corporate officer to act within his scope of authority and in the best interests of the corporation, thus resulting in the immunity recognized for conduct consistent with this fiduciary duty."). Because financial harm resulting from an officer's decision does not render that officer personally liable to her corporation in the absence of disloyal or unreasonable conduct, a financial loss to a corporation cause by a breach of contract does not, in itself, render the officer liable to a third party that has contracted with the corporation. *See* 8 La. Civ. L. Treatise, *Business Organizations* § 33.13 n.16 (2016) (suggesting that liability under *Spurney* is subject to the business judgment rule); *see also Gearheard v. De Puy Orthopaedics, Inc.*, No. CIV.A.99-1091, 2000 WL 533352, at *5 (E.D. La. Mar. 17, 2000) (citing *Spurney*, 538 So. 2d at 234) (holding that *Spurney* applies only to "intentional, rather than negligent, action by the defendant").[4] Hence, an officer is liable to a third party on a theory of tortious interference only if she "acted knowingly contrary to the best interest of the corporation." *Sun Drilling Prod. Corp. v. Rayborn*, 2000-1884, p. 22 (La. App. 4 Cir. 10/3/01); 798 So. 2d 1141, 1156.

---

[4] One Louisiana court has held that alleging that a corporate officer's conduct caused financial harm to a corporation states a claim for a lack of justification sufficient to defeat an exception of no cause of action. *Yarbrough v. Fed. Land Bank Ass'n of Jackson*, 616 So. 2d 1327, 1335 (La. Ct. App. 1993). However, under the more rigorous standards appropriate to summary judgment, a plaintiff must present evidence that generates a dispute of material fact regarding the officer's intent. Plaintiffs have not done so here.

While the Louisiana Fifth Circuit has recognized that whether an officer's conduct is justified is "to some extent, a subjective matter," *Commc'n & Info. Res., Inc. v. Expressions Acquisition Corp.*, 95-1070 (La. App. 5 Cir. 5/15/96); 675 So. 2d 1164, 1168, the facts adduced to date render this claim appropriate for summary judgment. Luquette has testified that he considered a variety of factors before reaching his decision to terminate the Le Chat contract. [Record Document 47-1 at 14]. These factors include the depressed oil and gas sector, the need to reduce construction and maintenance costs, the importance of having a building that reflected the conservative expectations of Frank's customers, the need for a building design optimized for the various working groups at Frank's, and the recommendations of a team of experienced industry consultants. [Record Document 47-3 at 16–19, 24–25, 28, 40–46, 54–55, 62]. Plaintiffs do not present evidence calling Luquette's reasoning process into question. Instead, Plaintiffs point to Mosing's testimony in which he speculates that Luquette elected to terminate the Le Chat contract because Luquette was "more comfortable" with Gensler. [Record Document 54-1 at 30]. Aspects of Luquette's testimony also suggest that he preferred working with Gensler and other companies with which he had an established relationship. [Record Document 47-3 at 42, 47, 61].

Viewing the evidence in the light most favorable to Plaintiffs, Mosing's testimony does not create a genuine dispute of material fact. Even if Luquette terminated the Le Chat contract due to his greater comfort with Gensler, evidence of such a motive would not warrant the inference that Luquette's decision was contrary to Frank's best interests. *See Sun Drilling*, 2000-1884, p. 24; 798 So. 2d at 1157 ("We do not believe that proof of the corporate officer's motive, without more, sufficiently establishes that the officer acted to the detriment of the corporation."). By failing to produce evidence undermining Luquette's explanation of his reasoning process, Plaintiffs have failed

to raise a factual question regarding whether Luquette acted unreasonably in light of the information he possessed at the time he terminated the Le Chat contract.

The parties are currently engaged in additional discovery of the cost and extent of Gensler's work on the Lafayette Project. Plaintiffs argue that this discovery will support their tortious interference claim because Luquette testified that he terminated the Le Chat contract in order to reduce costs, while Mosing testified that he believed Luquette terminated the contract because Luquette was more comfortable with Gensler. [Record Document 54 at 20–21].

Even if this discovery demonstrates that Frank's spent more money working with Gensler than it would have had it allowed Le Chat to complete the contract, this would only show that Luquette made a business decision that ultimately worked to Frank's disadvantage. Moreover, the discovery sought appears to relate solely to what occurred after the Le Chat contract was terminated. Plaintiffs have not explained how these post-breach events are probative of Luquette's mindset when he terminated the Le Chat contract. Finally, when granting Plaintiffs' motion to compel [Record Document 50], the magistrate ruled that the additional documents were relevant to the tortious interference claim "but only as [they] pertain[] to the calculation of damages." [Record Document 53 at 7]. Therefore, the nature and extent of the work performed by Gensler after it replaced Le Chat will not indicate whether Luquette's decision to terminate Le Chat was justified.

It also appears that Plaintiffs may wish to depose Jarod Altimore ("Altimore"), Frank's manager on the Lafayette Project. [Record Document 54 at 19–20].[5] However, the relevant facts concern what Luquette knew and believed to be true, not what Altimore knew. Luquette has been

---

[5] Plaintiffs repeatedly mention Altimore as a person with knowledge of Gensler's role in the Lafayette Project, but do not specifically state whether they intend to depose him. [Record Document 54 at 10–20]. Altimore's affidavit, submitted by Defendants, does appear in the record. [Record Document 47-7].

deposed. Plaintiffs have not explained how additional discovery of Altimore's knowledge will clarify whether Luquette's decision to terminate the Le Chat contract was one that Luquette reasonably believed to be in Frank's best interest.

The record evidence of what Luquette knew and believed at the time he terminated the Le Chat contract fails to raise a genuine issue of material fact. The additional discovery sought will not enable Plaintiffs to demonstrate that Luquette lacked a reasonable belief that he was acting in Frank's best interest. Therefore, the Court grants summary judgment on this claim.

### C. Le Chat's Breach of Contract Claim

Plaintiffs also claim four classes of damages arising from breach of contract: lost hourly income for design services Le Chat could not provide once it was removed from the Lafayette Project, lost profits from the mark-ups associated with furniture and accessories that Le Chat would have provided for the Lafayette Project, lost business opportunities due to allegedly foregoing other design work in order to concentrate on the Lafayette Project, and damages to Plaintiffs' reputation. [Record Documents 45 at 6 and 54 at 14–18]. Defendants argue that Plaintiffs cannot prove their damages with sufficient specificity to survive summary judgment. [Record Document 47-1 at 20–27].

The essential elements of a breach of contract claim in Louisiana are (1) the existence of a valid contract obligating performance; (2) the obligor's failure to perform the obligation; and (3) resulting damages. *Favrot v. Favrot*, 2010-0986, pp. 14–15 (La. App. 4 Cir. 2/9/11); 68 So. 3d 1099, 1108–09. Because Defendants have not briefed the first two elements, the Court will assume the existence of a contract between Le Chat and Frank's and that Frank's breached that contract when Luquette terminated Le Chat's involvement with the Lafayette Project. The Court will focus on the

third element: whether damages resulted from the breach.

Damages for breach of contract are measured by the loss a party sustains and the profit of which that party has been deprived. La. Civ. Code Ann. art. 1995 (2008). For lost profits, damages are the difference between the amount of money the obligee actually earned and the amount of money the obligee would have earned had the breach not occurred. *See Nesbitt v. Dunn*, 28,240, p. 15 (La. App. 2 Cir. 4/3/96); 672 So. 2d 226, 236–37. A plaintiff must prove both the existence and the amount of damages. *First Alarm Fire Equip., Inc. v. Southland Int'l of La.*, 47,823, p. 7 (La. App. 2 Cir. 5/8/13); 114 So. 3d 1168, 1172 (citing *Jackson v. Lare*, 34,124 (La. App. 2 Cir. 11/1/00); 779 So. 2d 808). While damages for lost profits need not be proven to a mathematical certainty, they must be based upon "a party's own detailed testimony." *Rosbottom v. Office Lounge, Inc.*, 94-894, p. 2 (La. App. 3 Cir. 4/5/95); 654 So. 2d 377, 378 (citing *Ed Bulliard Co. v. Foretich-Zimmer Const.*, 451 So. 2d 29, 31 (La. Ct. App. 1984)). Hence, Louisiana courts have consistently held that "loss of profits . . . cannot be based on speculation or conjecture." *First Alarm*, 47,823, p. 7; 114 So. 3d at 1172 (citing *Simpson v. Restructure Petroleum Mktg. Servs., Inc.*, 36,508 (La. App. 2 Cir. 10/23/02); 830 So. 2d 480); *see Judice Indus. Blasting & Coating Co. v. SBM Envtl., Inc.*, 2002-0064, pp. 8–9 (La. App. 3 Cir. 10/2/02); 827 So. 2d 584, 588–89; *Wasco, Inc. v. Econ. Dev. Unit, Inc.*, 461 So. 2d 1055, 1057 (La. Ct. App. 1984).

Although Plaintiffs do not bear the burden of persuasion at this juncture, they do bear the burden of producing evidence that, if true, establishes the amount of damages. *See ABC-Paramount Records, Inc. v. Topps Record Distrib. Co.*, 374 F.2d 455, 467 (5th Cir. 1967) ("[I]n a diversity case, state law controls as to the substantive elements of plaintiff's case and of defendant's defense, but the sufficiency of evidence to raise a question of fact for the jury is controlled by federal law.").

Hence, Plaintiffs must "cit[e] to particular parts of materials in the record" that demonstrate the existence of a dispute over the amount of damages sustained. Fed. R. Civ. P. 56(c)(1)(A).

### 1. Lost Income

Plaintiffs moved for additional time to complete discovery in order to determine how much design work remained to be completed on the Lafayette Project at the time that Luquette terminated the Le Chat contract. [Record Document 54 at 18–21]. Plaintiffs asserted that this discovery was necessary in order to calculate the number of hours that Le Chat would have worked to complete the Lafayette Project. [Record Document 54 at 20]. This Court granted the motion. [Record Document 65]. Because discovery is still outstanding on this issue, summary judgment is denied on this claim, although the motion may be re-urged upon the close of discovery.

### 2. Lost Profits

According to Plaintiffs, the intention of Le Chat and Frank's was that Le Chat would not merely suggest the ideal furnishings for the building, but that it would provide those furnishings and then bill Frank's for them. [Record Document 54 at 16]. In consequence, Le Chat would profit from acquiring the furnishings at a wholesale price, but then invoicing Frank's for a marked-up price. [Record Documents 47-4 at 33–36 and 54 at 17]. There are thus two potential issues in dispute: (1) whether the contract entitled Le Chat to provide the furnishings at a marked-up price and (2) whether Le Chat has met its burden of production as to the amount of damages.

The Letter of Engagement does not specifically state that Le Chat will procure the furniture for the Lafayette Project; rather, the document indicates that Le Chat will provide "professional services," which will include "sourcing furniture." [Record Document 47-5]. Because the Letter of Engagement specifically described the object of the contract as "professional services," the document

12

on its face does not indicate that Le Chat will <u>provide</u> the actual furnishings.

Recognizing this fact, Plaintiffs argue that the parties verbally supplemented the Letter of Engagement. [Record Document 54 at 16]. Extrinsic evidence is admissible to prove the verbal modification of a written contract. La. Civ. Code Ann. art. 1848 (Supp. 2017). To substantiate their claim that Frank's and Le Chat verbally modified their contract to specify that Le Chat would not merely select but also provide the furniture for the Lafayette Project, Plaintiffs point to a series of emails in October 2014 between Kocurek, Mosing, and Gamma Construction ("Gamma"), the general contractor on the Lafayette Project. [Record Documents 54 at 16, 54-1 at 17–20, and 54-2 at 3–4]. Plaintiffs allege that these emails memorialize the verbal modification. [Record Document 63 at 1].

Taken in the light most favorable to Plaintiffs, the emails demonstrate that Mosing believed that Frank's was party to a contract with Le Chat in which Le Chat would "arrange, select, and facilitate the furniture for the administrative building." [Record Document 54-2 at 4]. In his deposition, Mosing indicated his understanding that Le Chat's work on the Lafayette Project was to be "the same thing [Kocurek] did down in Alvin." [Record Document 54-1 at 18]. Plaintiffs have produced one invoice for work on Frank's Alvin facility, showing that Le Chat charged, in addition to its hourly fee, $3,174.12 for lamps and bulbs, a mirror, a clock, and some wall hangings. [Record Document 54-6 at 10]. However, Kocurek also testified that Frank's purchased the furniture for the Alvin building directly from suppliers rather than using Le Chat as an intermediary. [Record Document 47-4 at 55]. Additionally, nine days before Le Chat's involvement with the Lafayette Project was terminated, the project team still did not know whether Gamma or Le Chat was to

13

purchase the furniture.[6] [Record Document 47-7 at 10]. Indeed, it was only after Le Chat had been removed from the Lafayette Project that Frank's written contract with Gamma was modified to delete the line item compensating Gamma for procuring furniture. [Record Document 47-3 at 147]. Taken in the light most favorable to Plaintiffs, these facts demonstrate the parties' intention, as of October 2014, for Le Chat to provide Frank's with at least some of the furnishings for the Lafayette Project. Therefore, Plaintiffs have met their burden of production on the issue of whether the contract with Frank's entitled Le Chat to provide the furniture and accessories.

In order to recover for lost profits, Le Chat must produce "detailed testimony" regarding the amounts and sources of those profits. *Rosbottom*, 94-894, p. 2; 654 So. 2d at 378 (citing *Ed Bulliard Co.*, 451 So. 2d at 31). However, if there is at least "a minimal degree of detail or specificity," a damage award is proper even in "the absence of independent corroborating evidence." *Jackson*, 34, 124, p. 8; 779 So. 2d at 814. Here, Kocurek's affidavit estimates the commission or profit that Le Chat anticipated earning in various categories:

| | | | |
|---|---|---|---|
| A. | Furniture | $5,000,000 | 15% commission |
| B. | Artwork | $100,000 | 40% commission |
| C. | Window Shades (600) | $134,800 | 40% commission |
| D. | Draperies | | Profit $29,300.00 |
| E. | Rugs | | Profit $2,400.00 |
| F. | Lamps | | Profit $3,000.00 |
| G. | Greenery and Floral | | Profit $4,000.00 |

[Record Document 54-7 at 2–3]. While brief, this itemized statement satisfies Plaintiffs' burden at the summary judgment stage.

Defendants argue that because Gensler did not derive any profit from furnishings on the

---

[6] This team was composed of representatives of Frank's, Gamma, and Powers Brown, the building's architect. [Record Document 47-7 at 9].

Lafayette Project, Le Chat's claim for lost profits must fail. [Record Document 59 at 7]. However, Defendants misconstrue the damages that Plaintiffs seek. Plaintiffs do not claim damages for profits earned by <u>Gensler</u> that should have been earned by Le Chat. Rather, Plaintiffs seek to recover the profits that would have been made by <u>Le Chat</u> had Le Chat not been fired from the Lafayette Project. Gensler and Le Chat are different companies operating under distinct contracts with Frank's. Gensler's contract was broader in scope and included "site design, landscaping, and work-flow analysis" as well as architectural services; it did not provide for the purchase of furnishings through Gensler. [Record Document 47-7 at 2]. Le Chat's contract on its terms was limited to interior design, [Record Document 47-5]; whether it included the right to profit from the provision of furnishings is a subject of genuine factual dispute. As a result, the profits earned by one are not necessarily the same as the profits that could have been earned by the other. Therefore, Plaintiffs have shown a dispute of material fact sufficient to survive summary judgment on the issue of lost profits related to providing furniture and furnishings for the Lafayette Project.[7]

### 3. <u>Lost Business Opportunities</u>

Plaintiffs argue that Le Chat lost the opportunity to accept other design work because the

---

[7] Defendants also argue that the itemization of lost profits in Kocurek's affidavit [Record Document 47-7 at 2–3] impeaches Kocurek's deposition testimony and therefore cannot create an issue of material fact. [Record Document 59 at 6–7]. However, Kocurek's deposition testimony cited by Defendants is somewhat confused. While it may indicate that Le Chat never anticipated receiving certain commissions, that is not the only viable interpretation. Kocurek's deposition contains repeated references to her expectation of profits from providing furniture for the Lafayette Project. [Record Document 47-4 at 31–42]. Moreover, it appears that Kocurek was operating under a set of assumptions based on her prior business practice with residential and small business customers; on those projects, she did profit from providing materials at marked-up prices without this being expressly stated in a written contract. Because at summary judgment all inferences must be drawn in favor of the non-movant, *Reid*, 784 F.2d at 578 (citing *U.S. Steel Corp.*, 516 F.2d 961), summary judgment is inappropriate on this issue.

Lafayette Project monopolized Kocurek's time. [Record Document 54 at 14–16]. Defendants have responded that Plaintiffs have neither explained why Le Chat could not accept these opportunities nor provided an adequate evidentiary basis for the amount of damages claimed. [Record Documents 47-1 at 27 and 59 at 9].

Because damages include the profit of which a party has been deprived, La. Civ. Code Ann. art. 1995 (2008), lost business opportunities are cognizable damages, *Buddy's Tastee No. 1, Inc. v. Tastee Donuts, Inc.*, 483 So. 2d 1321, 1324 (La. Ct. App. 1986) (recognizing a claim for lost business opportunities, but finding no error in the trial court's denial of recovery under the facts presented). To prevail on a claim for a lost business opportunity, Plaintiffs must prove that it is "more probable than not" that, had Frank's not breached the contract, they would have availed themselves of the profitable opportunity. *See Wood v. Axis Energy Corp.*, 2004-1464, pp. 13–14 (La. App. 3 Cir. 4/6/05); 899 So. 2d 138, 148 (citing *Chesapeake Operating, Inc. v. Richardson*, 04-345 (La. App. 3 Cir. 10/13/04); 884 So. 2d 1263; *Edmundson Bros. P'ship v. Montex Drilling Co.*, 98-1564 (La. App. 3 Cir. 5/5/99); 731 So. 2d 1049) (describing an action for lost opportunity to re-lease mineral rights).

Plaintiffs have presented affidavit evidence of two allegedly lost opportunities that Le Chat declined in June 2014.[8] [Record Documents 47-6 at 7, 54-5 at 1–6]. However, Le Chat's own business records indicate income from 29 separate sources in 2014 and 30 separate sources in 2015; Le Chat was thus performing work for many clients other than Frank's during the term of the

---

[8] One job was to decorate a cabin in Telluride, Colorado, and the second was to decorate a master bedroom and bath. [Record Document 47-8 at 5]. Plaintiffs also contend that Le Chat declined a third business opportunity in September 2015, six months after the termination of its involvement with the Lafayette Project. [Record Document 47-6 at 7]. Plaintiffs have not explained why the Lafayette Project prevented Le Chat from accepting this work.

16

contract for the Lafayette Project. [Record Document 47-4 at 484, 487]. Additionally, Plaintiffs have not clarified how damages incurred prior to Frank's breach of the contract were caused by that breach. *See* La. Civ. Code Ann. art. 1994 (2008) ("An obligor is liable for all damages *caused by* his failure to perform a conventional obligation." (emphasis added)); *Sanga v. Perdomo*, 14-609, p. 7 (La. App. 5 Cir. 12/30/14); 167 So. 3d 818, 822 (citing *Favrot*, 10–0986, p. 15; 68 So. 3d at 1109) ("[T]he failure to perform must *result in* damages to the obligee." (emphasis added)). Until the Le Chat contract was terminated in March 2015, Frank's paid Le Chat for the time that it spent providing design services. Hence, because Plaintiffs claim that Le Chat declined these other projects due to a lack of time to work on them, Plaintiffs cannot also argue that they were deprived of hourly wages that they could have earned on these other projects for hours during which Le Chat was working on the Lafayette Project. If Plaintiffs would not have had time to work on the other projects and were fully compensated by Frank's at their hourly rate for the time that they would have spent working on the other projects, then Plaintiffs' ability to earn their hourly rate was unaffected for the time that they spent working on the Lafayette Project instead of these other projects.

However, taking the record evidence in the light most favorable to Le Chat, as the Court must at the summary judgment stage, it can be reasonably inferred that Le Chat made a business decision to concentrate on the Lafayette Project (for which it was receiving hourly compensation) as opposed to accepting other work. It is also possible that Le Chat would have accepted these other projects had Kocurek known that Le Chat's work on the Lafayette Project would end in March 2015. If that is the case, then Le Chat may have been deprived of the opportunity to perform some hourly design work as well as the opportunity to earn profits and commissions from providing furnishings for these other projects.

17

Therefore, because Plaintiffs have raised factual questions that suffice to satisfy their burden of production at the summary judgment stage, the Court denies Defendants' motion for summary judgment on Le Chat's claim for lost business opportunities.

### 4. Damage to Reputation

Plaintiffs have also alleged reputational damages. [Record Document 45 at 6]. While Kocurek's testimony indicates that others are aware that Le Chat was not allowed to complete the Lafayette Project, Kocurek was unable to provide testimony as to any damage Le Chat suffered as a result of this knowledge. [Record Document 47-4 at 163–67]. In the absence of actual damage, Plaintiffs cannot recover. *See Favrot*, 2010-0986, pp. 14–15; 68 So. 3d at 1109 (noting that recovery of damages for breach of contract may occur only where the obligor's "failure to perform resulted in damages to the obligee"). Therefore, Defendants motion for summary judgment is granted as to Le Chat's claim for reputational damages.

### D. Kocurek's Individual Claims

Kocurek claims that because she was party to an employment contract with Frank's, she thus has personal claims for breach of contract and tortious inteference. [Record Document 45 at 3, 6–8]. Plaintiffs allege that Kocurek signed the Letter of Engagement both individually and in her capacity as Le Chat's owner. [Record Documents 1-2 at 3–4 and 45 at 3]. Defendants have responded that Kocurek was never a party to the contract with Frank's and so has no claim in her individual capacity. [Record Document 47-1 at 28].

By definition, a breach of contract claim may arise only between parties in privity of contract. *Gurtler, Hebert & Co. v. Weyland Mach. Shop, Inc.*, 405 So. 2d 660, 662 (La. Ct. App. 1981). Similarly, protection from tortious interference extends only "to a third person having a contractual

18

relationship with the corporation." *Spurney*, 538 So. 2d at 231; *see Belle Pass Terminal, Inc. v. Jolin, Inc.*, 618 So. 2d 1076, 1080 (La. Ct. App. 1993) (holding that in the absence of privity of contract, a cause of action for tortious interference does not exist).

Korucek has admitted that she signed the Letter of Engagment on behalf of Le Chat Interiors. [Record Documents 45 at 3 and 47-4 at 29]. Indeed, Plaintiffs specifically allege that "[t]he contract was signed by Kathy Kocurek as President & CEO of Le Chat Interiors . . . ." [Record Document 45 at 3]. However, Plaintiffs argue that privity exists because Mosing "desire[d] to build a personal relationship with Ms. Korucek." [Record Document 63 at 6]. While Mosing's deposition testimony reveals that he "wanted to use somebody local that – that I could build a relationship with," he also testified that he did not initiate contact with Le Chat and that he approved the contract because her "firm seems to have experience." [Record Document 54-1 at 9–10]. The fact that Kocurek's skills may have been an important factor in the formation of the contract between Frank's and Le Chat does not warrant an inference that Kocurek was a party to the contract. Similarly, in her deposition, when asked if the contract was between Le Chat and Frank's, Kocurek responded, "Kathy Kocurek, Le Chat, Keith Mosing, Frank's, yes," [Record Document 47-4 at 29]; these were the four names on the Letter of Engagement being discussed at that point of the deposition, [Record Document 47-5]. Taken in the light most favorable to Plaintiffs, this evidence indicates Kocurek's unsophisticated understanding of the contract, but does not raise a genuine question of fact as to the identity of the contracting parties.[9]

---

[9] Moreover, this Court cannot award duplicative damages. *See Albert v. Farm Bureau Ins. Co.*, 2005-2496, p. 3 (La. 10/17/06); 940 So. 2d 620, 622 (citing *Gagnard v. Baldridge*, 612 So. 2d 732, 736 (La.1993)). Because Kocurek and Le Chat claim the same quantum of damages, Plaintiffs' recovery would not be increased even if Kocurek were a proper plaintiff.

19

Because Kocurek signed the Letter of Engagement in her capacity as a representative for Le Chat Interiors, she was not in privity of contract with Frank's. Therefore, Kocurek can maintain neither a breach of contract action nor an action against Luquette for tortious interference with the contract between Frank's and Le Chat. This Court dismisses each of her individual claims.

### III. Conclusion

For the reasons discussed above, Defendants' motion for summary judgment [Record Document 17] is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion for summary judgment is **GRANTED** as to the claim for tortious interference with a contract and all of Kocurek's individual claims. Summary judgment is also **GRANTED** as to Le Chat's claim for damage to its reputation. Summary judgment is **DENIED** as to Le Chat's claim for lost hourly wages, lost profits, and lost business opportunities. Upon the completion of discovery, this motion may be re-urged on the issue of lost hourly wages.

The claims on which summary judgment has been granted are hereby **DISMISSED with prejudice.**

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this /1st day of Oct, 2017.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE